**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

**UNITED STATES OF AMERICA,**

**v.**                                                    **Criminal No.: 2:15cr00118**

**PIETER HUNG REIDY,**

                    **Defendant.**

## POSITION OF THE DEFENDANT ON SENTENCING

COMES NOW the Defendant, Pieter Hung Reidy, by counsel, in accordance with Rule 32 of the Federal Rules of Criminal Procedure, Section 6A1.2 of the Sentencing Guidelines and Policy Statements as well as this Court's Sentencing Order, and hereby represents that the Defendant has reviewed the Probation Office's Pre-Sentence Report and sets forth the following as his position on sentencing:

## OBJECTION TO THE PRE-SENTENCE REPORT

Mr. Reidy, through counsel, has previously offered the following objection to the Pre-Sentence Report.  The Court should note that this objection affects the sentencing guidelines calculation.

1.      Mr. Reidy objects to the calculation of the Base Offense Level of 22 as set forth in Paragraph 18 of the Pre-Sentence Report.  This Base Offense Level was calculated pursuant to U.S.S.G. § 2K2.1(a)(3).  That subsection provides in relevant part that a base offense level of 22 applies if the defendant has a previous conviction for a controlled substance offense and the current offense involved a semi-automatic

1

firearm capable of accepting a large capacity magazine. U.S.S.G. §§ 2K2.1(a)(3)(A)(i), (a)(3)(B).

Application Note 2 provides that: "For purposes of subsections (a)(1), (a)(3), and (a)(4), a "semiautomatic firearm that is capable of accepting a large capacity magazine" means a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm."

Authorities did recover several semi-automation firearms along with several magazines capable of accepting more than 15 rounds of ammunition. However, it is unclear whether the magazines were either attached to or recovered in "close proximity" to the firearms as is required by.§ 2K2.1(a)(3).  For this reason, Mr. Reidy's Base Offense Level should be a 20 as set forth in U.S.S.G. § 2K2.1(a)(4).

## SECTION 3553 FACTORS

As the Supreme Court has long recognized, "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  With the United States Sentencing Guidelines now rendered "advisory only," *Kimbrough v. United States*, 128 S. Ct. 558, 564 (2007), a district court has substantial discretion in fashioning a sentence appropriate to the

individual circumstances of the defendant and the unique facts of the offense. While the Court must consider the guideline range in a case, "the Guidelines are not the only consideration." *Gall v. United State*s, 128 S. Ct. 586, 597 (2007), *see also*, *Kimbrough*, 128 S. Ct. at 564 ("the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

Indeed, as mandated by Congress, the fundamental principle of sentencing is that a court "*shall impose a sentence sufficient, but not greater than necessary*" to meet specified sentencing goals, including the goal of just punishment.  18 U.S.C. § 3553.  In determining the minimally sufficient sentence, §3553 directs sentencing courts to consider the following factors:

(1)    the nature and circumstances of the offense and the history and characteristics of Mr. Reidy;

(2)    the need for the sentence imposed;

      (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B)    to afford adequate deterrence to criminal conduct;

      (C)    to protect the public from further crimes of Mr. Reidy; and

      (D)    to provide Mr. Reidy with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentences and the sentencing range established for [the offense];

(5)     any pertinent policy issued by the Sentencing Commission;

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

18 U.S.C. Section 3553.

In addition, a district court "may not presume that the Guidelines range is reasonable," and instead "must make an individualized assessment based on the facts presented." *Gall*, 128 S. Ct. at 597. Moreover, the Supreme Court has specifically ruled that, in balancing the §3553(a) factors, a judge may determine that, "in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." *Kimbrough*, 128 S. Ct. at 564. *See Rita v. United States*, 127 S. Ct. 2456, 2465 (2007) (a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect §3553(a) considerations, or [that] the case warrants a different sentence regardless.")

Other statutes also give the district court direction in sentencing. For instance, under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to recognize that imprisonment is **not** an appropriate means of promoting correction and rehabilitation (emphasis added). In sum, in every case, a sentencing court must consider *all* of the § 3553(a) factors, not just the guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing.

4

## Introduction

Pieter Reidy is a young man who has overcome significant challenges and become a dedicated supporter of community causes and a tireless advocate for those who are less fortunate than himself. The crime for which Mr. Reidy has pled guilty is a status offense that was unrelated to any other criminal conduct. This is certainly atypical for this type of offense. As the Court well knows, firearms offenses are very often related to other serious crimes, such as drug trafficking, robbery, homicide, and other violent offenses. For all of these reasons, as well as the arguments set out below, a sentence within the range currently set forth in the Pre-Sentence Report is far in excess of what is just and necessary. Instead, a sentence of home confinement, coupled with a fine, community service and probation, provides for a just punishment that is sufficient, but not greater than necessary, to fulfill the goals of § 3553.

## Nature and Circumstances of the Offense

Mr. Reidy pled guilty to one count of Possession of Firearms by a Convicted Felon in violation of 18 U.S.C. §§ 922 (g)(1) and 924 (a)(2). The facts and circumstances of this offense are fully set forth in the Pre-Sentence Report and Mr. Reidy agrees that they are accurate. There are, however, numerous factors which the Court should consider in mitigation of Mr. Reidy's sentence.

The nature and circumstances of this case are uncharacteristic of the typical firearms case that comes before this Court. Very often, charges of this nature are ancillary offenses to other crimes such as drug trafficking and crimes of violence. Contrary to the typical case, the firearms in Mr. Reidy's possession were wholly

5

unrelated to any criminal activity whatsoever.  These guns were not recovered from a crime scene, they were not used in a robbery, nor were they found in a drug den.  The guns in this case were found unloaded and unused, collecting dust in storage.  It is Mr. Reidy's status as a felon alone that renders his actions criminal.

Mr. Reidy had one firearm, a 9mm handgun, in his residence, which he kept solely for personal protection.  Mr. Reidy did not carry this gun on his person or in his vehicle.  He kept this gun in its box, in his bedroom closet and rarely took it out.  In fact, the only evidence that the gun left the house was the occasion when he took it to the shooting range.  The firearms and related items that were found in the storage locker had been bought years earlier and were still in the same condition they were in the day they were purchased.  None of these guns had ever been fired and many of the items were still in their original packages, having never even been opened.  These guns, ammunition, and other items sat in a storage locker collecting dust for years, untouched and unused by Mr. Reidy or anyone else.

The truth is Mr. Reidy saw these guns and the other items as something of an investment opportunity.  He collected these firearms at time when many people in the industry thought that they were likely to be soon banned at the national level.  Of course, such a ban has not yet happened, but the thought at the time was that if a ban was instituted, the guns would increase in value exponentially.

While Mr. Reidy's actions were undoubtedly misguided, there was no real criminal intent on his part.  Even the agents who arrested Mr. Reidy recognized this, noting, during their interview of Mr. Reidy, that he struck them as someone who was just

a collector.  Mr. Reidy's father, Frank Reidy, who knows his son probably better than anyone, echoes these sentiments.  Frank Reidy knows and has expressed to the Court that Pieter's intentions, albeit misguided and naïve, were not criminal or nefarious.

That said, Pieter takes full responsibility for his conduct and for his failure to follow through and have all of his rights fully restored.  As the Court knows, Mr. Reidy was convicted of a federal felony drug crime in 2004 for which he was sentenced to probation.  Following his release from probation, Mr. Reidy petitioned for and was granted a restoration of his civil rights by the Governor of Virginia.  That restoration, however, did not include a restoration of his right possess a firearm.  For that, he would need to have his right restored by federal authorities.

Unfortunately, this proved to be impossible.  Although federal law provides that officials at the Bureau of Alcohol, Tobacco, and Firearms have the authority to restore gun rights, Congress has effectively stripped them of this authority by refusing to appropriate any funds for the agency to process applications from individuals seeking restoration. Thus, the only avenue available to Mr. Reidy was a presidential pardon.  Mr. Reidy did in fact apply for a presidential pardon in 2008 after having completed his federal probationary period.  Regrettably, his application was never considered on its merits because he had not waited a sufficient period of time between the end of his probation and his application.  This caused Mr. Reidy's pardon petition to be administratively closed shortly after he filed it.

As the years went by, Mr. Reidy let his better judgment lapse and ultimately purchased these firearms despite the fact that he had not had his rights fully restored.

At the time, Mr. Reidy certainly did not appreciate the gravity of his actions or the fact that he was committing a serious felony offense.  Today, with the benefit of hindsight and viewing his situation through the prism of the terrible consequences he is facing, Mr. Reidy regrets more than anything that he never followed up on the pardon process and reapplied.

Again, Mr. Reidy takes full accountability for his conduct and accepts whatever punishment the Court imposes upon him.   Mr. Reidy cooperated with investigators immediately upon his arrest, providing a full statement detailing his activities. Furthermore, he has pled guilty to this offense and accepted responsibility for his actions.  His acceptance, along with the circumstances and atypical nature of this offense weigh heavily in favor of mitigation and Mr. Reidy asks that the Court give these factors great weight in fashioning an appropriate and just sentence.

### History and Characteristics of Mr. Reidy

Pieter Reidy was born in Singapore on March 5, 1979.  He was born with spina bifida and doctors said that he would never walk and that he would be confined to a wheelchair.  The doctors in Singapore were not even willing to attempt surgery.  Mr. Reidy's parents, Frank and Juliette, were unwilling to accept this prognosis and they sought out and located a surgeon in Philadelphia who was willing to try to perform a risky surgery with the hope that, if successful, it may give Pieter some use of his legs. Pieter underwent his first operation when he was just six months old.  Following a series of surgeries and therapies—and what his father termed a miracle—Pieter began to walk

with the help of leg braces.  Eventually, he was able to walk on his own but he would never be able to run.

Throughout his entire life, Mr. Reidy has had to continue to manage the debilitating effects of his condition including chronic pain and limited kidney function. None of this, however, has ever stopped him from persevering, overcoming these limitations, and achieving his goals.   Even as a small child Mr. Reidy showed remarkable tenacity and strength of spirit.  Although he was unable to run, he wanted to play sports like his two older brothers.  He decided that he was going to be goaltender in the local youth soccer league.  Not only did he play, he excelled.  According to his father, young Pieter was fearless in the goal; a trait he has continued to carry with him.

When he was seven-years-old Pieter and his family moved to America and he decided to try his hand at lacrosse; again as goaltender.  There were no doubt those who thought that, given his physical limitations, Pieter could not play or that he would be a detriment to the team.  Not only could he play, he won team MVP in both the youth league and later, as goaltender at Norfolk Academy. His childhood achievements in sports foreshadowed the tremendous successes he would go on to achieve in business and community and charity work.

All of his accomplishments Pieter credits to his inner strength and positive outlook, which he in turn attributes to his upbringing.  Pieter's family is very close and his current legal troubles have devastated his brothers and parents.  Pieter's parents raised him and his brothers in a household that instilled in the children the importance of traditional values of family, fidelity, and faith in God.  Pieter and his brothers learned the

value of discipline, dedication, perseverance, and hard work. Pieter's parents also imparted in their children, especially Pieter, the ideal of civic responsibility and the notion that one should endeavor to serve his community.

The Court has received dozens a letters on Mr. Reidy's behalf. These letters have been submitted by members of Congress, local politicians, prominent attorneys and business people, religious leaders, family, friends, business partners, and employees. The varied and disparate backgrounds of the many people who took it upon themselves to write to the Court in support of Mr. Reidy are truly astonishing. That so many people, from so many different facets of society, are uniform in their assessments of his character is itself, a testament to Mr. Reidy's deep and long-standing commitment to charitable endeavors both local and international. It is also a testament to his love for and commitment to the Hampton Roads community.

Those who know him best describe Mr. Reidy as a person who is enthusiastic, compassionate, and generous. Pieter is the kind of person that anyone would be proud to call their employer, partner, mentor, friend, brother, or son. Clearly, Mr. Reidy has had numerous advantages in his life, including the benefits of wonderful family, a top-notch education, and financial resources. Despite all of the advantages and opportunities he had, Mr. Reidy has never taken any of them for granted and he has always worked extremely hard—whether it was in sports as a child, or his later in his myriad business, charitable, and community endeavors —to achieve at the highest levels. A fine example of this is contained in the letter submitted by Mr. Thomas Henry, which recounts Mr. Reidy's work as a roustabout for an oil company during two

summers in high school. (Letter of T.homas H. Henry, Feb. 16, 2016) Despite his physical limitations and the chronic pain, Mr. Reidy, for two summers, chose to do a job that is hot, dirty, dangerous, and unforgiving. He did this work without complaint and won the respect and acceptance of many older, experienced workers. (*Id.*) What is really remarkable about this is not that Pieter was able to do the work despite his physical issues; it is that he did not seek the easy path. Pieter could have easily used his family's connections and secured an internship in a cushy office and no one would have thought any less of him. But, that is not Pieter's nature; he does not take the easy way out. He meets challenges head on and he perseveres.

Likewise, Mr. Reidy has never failed to take the opportunity to lend a hand and assist a person in need. Mr. Reidy is well known for his generosity and selflessness when it comes to the needs of others. The letters submitted to the Court speak volumes about his true character. Former United States Senator and Virginia Governor George Allen praises Mr. Reidy as "an entrepreneur with a charitable heart," an opinion expressed many times over. (Letter of George Allen, Feb. 2, 2016) Congressman Scott Rigell commends his friend Pieter for his "great concern for our community" and his high degree of active and dedicated commitment to local business and philanthropy to which others should hope to aspire. (Letter of Scott Rigel, Mar. 12, 2016) Virginia Beach Mayor Will Sessoms likewise lauds Pieter's humanitarian efforts such as the JT Walk to Defeat ALS, which Pieter helped organize to raise money for ALS research, and his work with the Grommet Island Handicap Accessible Beach Park. (Letter of William D. Sessoms, Feb. 18, 2016)

Pieter's kind nature and penchant for fair dealing is a common thread as well. For instance, local Attorney Gregory Montero, who has worked with Mr. Reidy for a number of years, notes his willingness to be cooperative and conciliatory even towards adverse parties who had wronged him.  (Letter of Gregory J. Montero, Mar. 14, 2016) Attorney Montero also conveys that such an attitude, as well as Pieter's willingness to compromise and work together made Pieter unique among the many clients he has worked with in over fifteen years of practice. (*Id.*)

It is not just prominent attorneys and politicians who stepped up to speak on Mr. Reidy's behalf.  His own employee—long-time personal assistant Vanessa Ursery— talks about how Pieter values the importance of family and how has gotten to know her family and even sponsored her son's sports teams. (Letter of Vanessa Ursery, Mar. 7, 2016) Ms. Ursery also recounts the enthusiasm he brings to every project he tackles. Whether it is rehabbing an historic property or raising money to buy an elementary school music program new instruments, Pieter consistently demonstrates the same dogged level of commitment and contagious passion. (*Id.*)

Jessica Brashear, who is a friend of Ms. Ursery and a stay at home mother of two children recounts many of the same sentiments.  Ms. Brashear met Pieter through Vanessa and quickly saw his generous and charitable nature.  She recalls many of his philanthropic endeavors including the Artistree Music and Arts Festival, which allowed local musicians and artists a platform thorough which to bring their work to the public. (Letter of Jessica Brashear, Mar. 15, 2016)  She also recalls how, shortly after they met, Mr. Reidy sponsored her son's youth soccer team.  (*Id.*)  What is most striking about

this is that he did not simply write a check, he actually attended the four year olds' games. (*Id.*) Ms. Brashear is certainly correct when she says that few people have done so much, so selflessly, for the Hampton Roads community as Pieter Reidy. (*Id.*)

Whether it is loaning his own home to a friend in need,[1] redeveloping dilapidated properties into green and affordable housing for students, young professionals and Section 8 residents, or travelling around the world for Operation Smile, Pieter Reidy truly personifies the ideals of selflessness, compassion, friendship, and community. Andrew Yancey, who is one of Pieter's oldest friends and Vice Chairman of the non-profit Virginia Gentlemen Foundation, has worked with Pieter on numerous charitable endeavors. Much akin to the sentiments expressed by Ms. Brashear, Mr. Yancey notes that while many donors simply write a check for the name recognition or to reap advertising benefits, Pieter puts his time and effort into the cause as well. (Letter of Andrew Yancey, March 15, 2016) He not only shows up to the events, but always offers to assist in any way needed.

Perhaps the starkest example of this is his work with Operation Smile. Far from just giving money, Mr. Reidy has long been an integral member of the Operation Smile team. Operation Smile provides surgeries free of cost to children who are born with cleft lip, cleft palate, or other facial deformities. It is an international organization that has a presence in many of the world's poorest regions. Pieter has been an active member of Operation Smile for over 16 years. Given his own difficulties throughout his life, Operation Smile's mission is very dear to Pieter. He has travelled around the world

---

[1] See Letter of Megan Council, Mar. 15, 2016 (describing when she was bedridden in the hospital in Norfolk prior to and after the premature birth of her first child, Pieter insisted that her husband use Pieter's home in Norfolk so that he would not have to drive back and forth to the couple's home in Franklin.)

as an ambassador for the organization.  Pieter does whatever is asked of him; speaking, organizing, hosting fundraisers, doing outreach projects.

Notably, Pieter is also the founder of OpSmile Student Day. This an educational forum held locally each year that brings together roughly 40 international medical volunteers and 300 fifth-grade students.  This forum teaches the students about Operation Smile and its mission as well as educating them about the lives of fifth graders around the world.  In addition, this forum helps to plant the seed of philanthropy and civic duty in the minds of the students.

While the many eloquent words written on his behalf provide considerable insight to the Court on exactly the type of person Pieter Reidy is, his actions speak far louder. His tireless dedication to this worthy cause and many others, local and international, show that he is man worthy of redemption, worthy of the Court's mercy, and worthy of a second chance.

Pieter also volunteers his time and support in various capacities to organizations such as the Old Dominion Athletic Foundation, where he is a long time member of the finance committee; the Crystal Club, which promotes restoration of local waterways through the use of oyster beds; and the Nuns of the Order of Vincent DePaul, Vietnam, which develops schools and hospice care centers in southern Vietnam.  He is also a supporter of the Chrysler Foundation, the Pagoda Foundation, and Orangutan Foundation International.  This list encompasses just a few of the charitable and non-profit organizations in which Mr. Reidy is active.

Mr. Reidy realizes that his good character and charitable works do not entitle him to a free pass.  While commendable, they cannot make up for his role in this offense and he understands that he will not avoid punishment.  He asks, however that the Court consider the punishment he has already endured in mitigation of its sentence.

Mr. Reidy's businesses have suffered, as have his charitable endeavors.  His reputation has also suffered as he has had to endure the embarrassment and publicity that his actions have brought upon him.  Mr. Reidy is obviously very well known, especially in the local community and it seems that everyone knows about his situation.  He will carry the stigma of this conviction with him everywhere he goes.

Mr. Riedy's good character and long-time commitment to his community, though not adequately accounted for in the guidelines calculations, weigh heavily in favor of a below-guidelines sentence.  This misguided lapse in judgment is clearly out of line with Mr. Reidy's true character and inconsistent with the high moral standards to which he holds himself.  This Court may, and should, weigh heavily  Mr. Reidy's good deeds, charitable work, service to the community, and generous and compassionate nature when fashioning is sentence.  *See United States v. Rita*, 551 U.S.  338, 365 (2007) (Stevens, J., concurring) (noting that the sentencing court may properly consider service to the public in fashioning its sentence pursuant to the §3553(a) factors); *United States v. Cooper*, 394 F.3d 172, 178 (3d Cir. 2005) (noting that a downward departure may be appropriate if a defendant has demonstrated a history of exceptional good works in the community),  *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (noting defendant's good deeds, generosity, and acts of compassion).  Moreover, the

Court may impose a below guidelines sentence where the defendant's conduct falls outside of his life and character as a whole.  *See, United States v. Benkahla*, 501 F. Supp. 2d 748, 761 (E.D. Va. 2007) (holding that defendant's "significant number of strong, positive relationships with friends, family, and the community" as wells as numerous letters "attesting to his honor, integrity, moral character, opposition to extremism, and devotion to civic duty" are all factors that weigh heavily in favor of a below-guidelines sentence).

Taken as a whole, Mr. Reidy's history and characteristics—his strong family ties, his charitable works, his exceptional moral and ethical standards, civic-mindedness, and compassionate and generous nature—certainly compel a below-guidelines sentence.

### The Need for the Sentence Imposed to Reflect the Seriousness of the Offense Promote Respect for the Law, to Provide Just Punishment and to Afford Adequate Deterrence to Criminal Conduct

Mr. Reidy certainly understands the seriousness of this offense and the harm that resulted from his ill-conceived and misguided lapse of judgment.  Of course, while the Court has a duty to impose a sentence that provides for adequate deterrence to criminal conduct, it is not necessary, nor is the Court required, to impose a period of incarceration to achieve that goal.  *See, United States v. Edwards*, 595 F.3d 1001, 1016 (9th Cir. 2010) (noting that §3553 does not require that the goal of general deterrence be met through a period of incarceration and upholding district court's sentence of probation and restitution despite a guidelines range of 27-33 months and despite the fact that defendant had a felony record for a similar offense).

Mr. Reidy is a man of some stature and he is well known in the local community. The harm to his reputation and to is business and charitable ventures, while impossible to quantify specifically, is undoubtedly substantial. Likewise the shame and embarrassment he has suffered and will continue to suffer is significant and should not be discounted. He worked tirelessly for many years to put his youthful mistakes behind him, to regain his civil rights, and to build his good name. Now, all of that is gone, perhaps forever. There is no need to incarcerate Mr. Reidy to achieve the goals of sentencing. In this case, the felony conviction itself, with all of its attending stigmas and disadvantages, along with the publicity surrounding this investigation and sentencing, as well as sentence of home confinement, probation, community service, and a heavy monetary penalty, all provide a substantial punishment and more than ample deterrence. Such a sentence also promotes respect for the law and reflects the seriousness of the offense. *See, United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (holding that the district court, in fashioning a below-guidelines sentence, properly considered a number of "atypical" punishments defendant suffered including loss of his reputation and business).

In a similar vein, the Court must endeavor to impose a sentence that will protect the public from future crimes by Mr. Reidy. Unquestionably, there is no need to impose a prison sentence to achieve that end. Mr. Reidy presents none of the factors that signify a high risk of recidivism. His one prior criminal conviction was a youthful offense for which he received only probation. He successfully completed all of his probationary requirements and subsequently had his civil rights restored. Mr. Reidy has no issues

with drug abuse and no history of mental health issues.  Furthermore, Mr. Reidy has a

strong family and social support system consisting of scores of individuals who stand

ready to assist him in any way needed during this difficult period.  He also has the

means and wherewithal to earn a good living as he is well-educated, has many

marketable skills, and possesses uncanny business acumen.   Most importantly, he has

learned from his mistakes and he has demonstrated significant remorse and

acceptance of responsibility.  His greatest desire is to put this ordeal behind him as a

valuable, though costly, lesson learned and to move on with his life.

　　　Furthermore, Mr. Reidy has undergone a thorough psychological examination by

Dr. Leigh Hagan, a well-respected clinical psychologist.  Dr. Hagan will be presetn to

testify at Mr. Reidy's sentencing and is expected to testify that Mr. Reidy, by all

measures, is a very well-adjusted individual who presents a low risk of recidivism.

　　　The Court must also consider the significant restraints imposed upon Mr. Reidy's

liberty while awaiting disposition of this matter.  After his arrest on the initial state

charges, Mr. Reidy spent several harrowing days in a local jail before being released

upon numerous conditions of bond.  After he was finally released from custody, Mr.

Reidy spent roughly two months on bond in the state system.  For the past eight

months, Mr. Reidy has been under the strict supervision of the Federal Probation Office.

He has kept all of his appointments with probation, and he has passed all of his drug

screens.  All the while, his ability to run his businesses and meet his obligations with

respect to his charitable works has been significantly curtailed.  He is not even

permitted to live in his own home, having been ordered to live with his parents.  All of

this, along with the permanent damage to his reputation and loss of his civil rights, represents a significant punishment.

All these factors signify that there is virtually no likelihood that Mr. Reidy will reoffend or violate any of the terms the Court imposes upon him.  Furthermore, all of these factors, along with Mr. Reidy's characteristics and background also confirm that sentence consisting of home confinement, probation, community service, and hefty fine is a just punishment and is more than sufficient to deter future unlawful conduct.

### The Need to Provide Mr. Reidy with Educational or Vocational Training, Medical Care, or Other Correctional Treatment

As noted above, there are no issues with respect to drug or alcohol abuse that the Court needs to address.  Nor is Mr. Reidy in need of educational or vocational training or any type of mental health therapy or counseling.  He is a remarkably well-rounded and well-adjusted individual with widely diverse interests and thirst for learning that branches into many, many, different fields.

Mr. Reidy, however, obviously does have considerable medical concerns far over and above that of the typical defendant who comes before this Court for sentencing. Mr. Reidy has done remarkable job of handling his physical issues.  He has never let his disability stand his way but, the fact is, his medical concerns are serious and unlikely to be adequately addressed in prison.  The Pre-Sentence Report details a litany of issues that Mr. Reidy deals with on a daily basis.  The Court also has the benefit of the letter from Mr. Reidy's physician, Dr. Glenn Jones, which details the chronic, intense pain that Mr. Reidy endures and the required self-catheterizations multiple time per day.  (Letter of Glenn C. Jones, M.D., Feb. 24, 2016)

Given his condition, even a brief prison sentence would inflict a remarkable hardship upon Mr. Reidy and would effectively punish him far more severely than the typical defendant. A sentence of home confinement, followed by a lengthy probationary period, community service, and a heavy fine is just and substantial punishment.

## The Sentencing Range Established for the Offense

The Pre-Sentence Report sets forth a total offense level of 23 and criminal history category of I. The resulting guideline range is 46-57 months, which is exceptionally high given the circumstances of the offense. If the Court sustains Mr. Reidy's objection to the guidelines, the resulting guideline range would be 37-46 months (representing a total offense level of 21 and criminal history category I).

Furthermore, the Court should also be cognizant that the guidelines provide for— in many situations akin to Mr. Reidy's— a six-level decrease when the firearms at issue were used solely for sporting purposes or collection. *See* U.S.S.G. §2K2.1(b)(2). Such a reduction would result in a guidelines range of 18-24 months.

Unfortunately, the arbitrary quirks of the sentencing guidelines render Mr. Reidy technically ineligible for this reduction because of the nature of his prior conviction, *i.e.,* a controlled substance offense. Thus, even though his prior conviction was a non-violent drug offense for which he received probation, and even though the firearms sat in storage for years unused, and even though all of the evidence in the case shows Mr. Reidy was merely a collector, he is ineligible for this reduction. While Mr. Reidy is not technically eligible for this reduction, the Court can still consider the stark similarly in circumstances when determining a just sentence.

20

Further, although the guns were never used, the high guidelines in this case are driven primarily by the quantity and nature of the firearms found in the storage unit. The Court should be very wary of adhering too closely to the cold calculations of the guidelines. To do so, places far too much emphasis on arbitrary numbers and bare arithmetic and devalues the actual circumstances of the individual case. In addition, such an approach unduly minimizes the weight given to all of the § 3553 factors that the Court is bound to consider.

Even the low end of this reduced range represents a sentence much greater than necessary to meet the mandates of § 3553. It is not necessary to punish harshly to promote respect for the law. In this case, a sentence of imprisonment will serve to benefit neither Mr. Reidy nor society, and in all likelihood will have the opposite effect. *See*, *Gall v. United States*, 552 U.S. 38, 54 (2007) (recognizing that a sentence of imprisonment may also serve to "promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances" of the case). For these reasons, Mr. Reidy asks that the Court fashion a non-incarcerative sentence of home confinement and probation, and further require that Mr. Reidy perform significant community service and pay a heavy fine. Should the Court still see fit to impose a period of incarceration, Mr. Reidy respectfully requests that the Court recommend that the Bureau of Prisons designate Mr. Reidy to serve his sentence at the Federal Medical Center in Butner, N.C. This is the facility closest to Mr. Reidy's family here in Hampton Roads that can best address Mr. Reidy's significant medical needs.

21

Finally, should the Court impose a period of incarceration, Mr. Reidy intends to move the Court to allow him to remain on his current bond for period of 60 days pending his designation to a federal facility by the Bureau of Prisons.  His numerous medical concerns aside, there is no benefit to Mr. Reidy or to society, and certainly none of the goals of § 3553 are met by incarcerating Mr. Reidy at a local jail until his designation.

## CONCLUSION

For the reasons set forth above, the Defendant, Pieter Hung Reidy, by counsel. respectfully submits that a sentence consisting of home confinement, community service, probation, and a significant fine, will accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553.

Respectfully submitted,

PIETER HUNG REIDY
By Counsel

_____/s/_____
James O. Broccoletti, Esquire
VSB# 17869
Counsel for Pieter Hung Reidy
ZOBY & BROCCOLETTI, P.C.
6663 Stoney Point South
Norfolk, VA 23502
(757) 466-0750
(757) 466-5026
james@zobybroccoletti.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of May, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Andrew C. Bosse, Esquire
Assistant U. S. Attorney
*Office of the United States Attorney*
101 W. Main Street
Suite 8000
Norfolk, VA 23510

_____/s/_____
James O. Broccoletti, Esquire
VSB# 17869
Counsel for Pieter Hung Reidy
ZOBY & BROCCOLETTI, P.C.
6663 Stoney Point South
Norfolk, VA 23502
(757) 466-0750
(757) 466-5026
james@zobybroccoletti.com

I hereby certify that on the 3rd day of May, 2015, I caused a true and correct copy of the foregoing Motion to be mailed to the following non-filing user:

Anita G. Powell
U.S. Probation Officer
827 Diligence Drive, Suite 210
Newport News, VA 23606

_____/s/_____
James O. Broccoletti, Esquire
VSB# 17869
Counsel for Pieter Hung Reidy
ZOBY & BROCCOLETTI, P.C.
6663 Stoney Point South
Norfolk, VA 23502
(757) 466-0750
(757) 466-5026
james@zobybroccoletti.com